Case number 24-1024. Southie Gulf et al. petitioners versus United States Department of the Interior et al. Ms. Hardy for petitioners Southie Gulf et al. Mr. Anderson for the respondents. Mr. Marotta for the intervener. Ms. Hardy. Good morning your honors. May it please the court. I'm Brettany Hardy for conservation petitioners. I'd like to reserve three minutes for rebuttal. The offshore oil and gas program we've challenged is vast in scope with long-term consequences for the people and ecosystems in the Gulf of Mexico, already burdened by the pollution and land loss caused by decades of development. It opens nearly 80 million acres for leasing in each of three lease sales and enables oil production to continue for up to 50 years, underscoring the need for a balanced, rigorous analysis. But Interior didn't do that here for three reasons, each of which warrant vacature. First, Interior reached an inequitable decision to lease in areas where vulnerable communities are already overburdened, a decision undermined by its admitted failure to conduct the necessary comparative analysis. Second, Interior inexplicably left impacts to the most endangered whale out of its sensitivity analysis and decision to offer a bunch of areas for leasing in the whale's habitat. And third, Interior failed to evaluate conflicts with other vital ocean uses, which didn't factor into Interior's decision to open areas important for wind development, aquaculture, and fishing. I'd like to address... Well, let me just start here. API is out of the case, obviously, but they had claimed that you all did not have standing, so I just wanted you to address that. Yes, Your Honor. Petitioners have members that talk about a broad coverage of harms, including their interests in the Gulf waters and coastlines. They show how their interests will be harmed by additional leasing and that they plan to continue using the areas in the program. This court held that's enough in Center for Sustainable Economy and Center for Biological Diversity, but we have an even easier way to show standing here for the straightforward reason that the harms are starting now. As a result of the release of the program, because as soon as the program is released, oil companies have an incentive to survey the entirety of the Gulf using seismic surveys, which will incrementally harm Rice's whale, as our member, Dr. Hildebrand, described. And other members' interests and abilities to observe these and other mammals, including George Small, Robert Weigel, and Scott Eustace. Turning to the inequitable treatment of communities, I want to step back quickly and just explain when we're talking about environmental justice here, we're talking about vulnerable communities and trying to make sure the same people who have been forced to live with all these impacts from development are not forced to live with them longer or that the impacts don't worsen. And there's two things Interior had to do in the program. It failed both. First, they had to figure out whether the program would be fair to communities in different areas. And second, it had to weigh the cost to communities against benefits. So turning to the first one, this is under Section 18A2B. Interior admits that they didn't do the equitable sharing analysis that was required. They said they would do it later. But it's undisputed that Section 18A2B, by its very terms, requires Interior to do a comparative analysis to evaluate whether there's equitable sharing among regions. And that has to be done at the program stage. So one of the things, as sort of a threshold matter, Interior says that WHAT2 held that that analysis, the A2B analysis, doesn't even refer to onshore communities. And it did say that that's beyond what the statute requires. So what is your best distinction of WHAT2 other than, you know, maybe there's not a ton of rationale, but that is what it holds, isn't it? Your Honor, I would direct the court's attention to the decision in NRDC v. HODL, where this court explicitly addressed the definition of region and determined... And the issue is that WHAT2 was first. And under our panel precedent rules, we have to follow the decision that was issued first. So we would need, I think, some distinction of WHAT2. And that's what I'm wondering if you have any ideas about. Well, WHAT2, Your Honor, followed a decision in WHAT1, where this court was addressing the very first program Interior wrote. And in that decision in WHAT1, the court found that Interior didn't address oil spills properly because they talked about oil spills, but they didn't look at the differential effects of oil spills to different areas. And then in WHAT2, so Interior had to go back and do the analysis. WHAT1 found that that was completely lacking. In WHAT2 then, Interior redid that analysis. And that decision was about whether it was adequate enough. We are more akin to WHAT1 here, where the Interior Department didn't even do the analysis that was required. And these impacts affect communities that are right on the shore. If you look at Section 18A3, it's talking about impacts to the coastal zone. And there are other reasons that this issue falls under the statute. First, Section A2B itself embraces the concept of environmental justice by talking about equitable sharing. If you even want to compare the benefits to the risks, all the benefits are about onshore benefits, so benefits like jobs, revenues. If you don't talk about the onshore risks on both sides of the ledger, you're not doing justice to the terms of the provision. And even if this court believes that this isn't required, that Interior was going above and beyond, here Interior determined that these impacts were relevant. And so it put this at issue. Once it did that, it has a legal obligation to investigate the statutory requirements and to draw non-arbitrary conclusions. And you can look to New Jersey Conservation Fund for that principle, which we cite in our brief. Interior doesn't dispute that it included environmental justice concerns among the risks that needed to evaluate. So, turning back to Section 18A2. Was Interior allowed to use some discretion in how it selected its modeling approach? Yes, Your Honor. Interior has discretion to evaluate this equitable sharing analysis. The problem here is, though, it didn't use any, it didn't do the analysis at all. And Interior admits that it didn't do the analysis. In the program, Interior concluded, ultimately, that all coastal communities can be disproportionately impacted and decided to lease in the western and central Gulf because it's already saturated with tons of infrastructure. So the risk, quote, deferred consideration. In fact, they considered it to the extent appropriate to this stage. And so what they said for the environmental equity issue and the other uses issue was, you know, here's what, we're aware of these issues, and they're not going to dissuade us from our program stage plan, but we're going to look at them in more detail later. So I guess, for the comparative communities, there are these charts that admittedly are high level and you think they should have been more detailed, but that's the kind of thing that Interior said they would get more specific about later. And I'm trying to figure out what's wrong with that general approach. Your Honor, we're arguing that Interior didn't do what was required at this stage. There's more that could be done later, but at this stage, they, while one court held that the Section 18A2B, by its very terms, requires a comparative analysis. And if you turn to... Right. And then they have the charts and they have pages of analysis of, for example, the different poverty rates along the Gulf Coast. And they say, you know, we will consider those when we're conducting actual lease sale. And I want to get to that chart. I just want to emphasize what Interior said in the record at 9-11. They said at this program stage, they didn't identify specific communities that may be impacted, but rather the types of impacts, and that they would do the regional or inter-area analysis later. Section A2B says you have to look among regions, but turning to the grid, respondents are trying to cobble together the analysis in their briefs that they admit that they saved for later, but the vast majority of the pages they point to are just informational, which is all that an environmental impact statement is. It's information that the agency can use to evaluate. But there are a few problems with the grid itself. That's the one page that they think gets them closest, and that's at 7-1. There's no headline announcing that that's where the OXLA-required analysis is included, either in the program or the EIS. This is something respondents are pointing to for the first time in briefing. But even looking at the grid, it's a poor substitute. It's merely a symptom of the disease. It's not doing anything to fill in the blanks. Row 14, which is perhaps most relevant, all it shows is where there may be impacts, which doesn't compare or explain the sensitivity of different areas. Nowhere is that more evident by the fact that the only places where no impacts are the areas which already are suffering the most, and they don't have any analysis to support that conclusion. We think that's arbitrary because it ignores continuing impacts on these communities and the fact that the harms intensify with more use, which is the study we cite in the record. At the very least, Interior couldn't treat the and Western Gulf areas equally because, in the record, the Western Gulf benefits were very low. So if Interior had actually compared the sensitivity of these two regions and incorporated the impacts into their decision, they would have decided, we think, to leave the Western Gulf out, and they didn't do that because the benefits are very low there. It's important to repeat that Interior itself has said it's not doing this analysis. Now, earlier you mentioned that they did have some discretion, but you were challenging how they did their analysis. So do you challenge the methodology with respect to the EJ Screen or the Social Vulnerability Index? No, but Interior said that it's not going to use those tools. It's going to use those tools later. It described those tools, but said, we're not going to use them now. We're going to use them at later stages, and those would have been perfect tools to use now to actually understand the sensitivities of these communities and compare them, which is what OCSLA requires. Even if Interior had done this analysis, this equitable sharing analysis, there's still a second problem. They didn't do the proper balancing under Section A3, and Interior said that they're going to use a cost-benefit approach, and they were able to put some environmental costs in monetary terms. Even if these impacts to vulnerable communities couldn't be put in monetary terms because they were too uncertain, they still needed to weigh them against the benefits, and they didn't do that. And they knew how to do this. As we pointed out in our brief, catastrophic oil spill costs were too uncertain, but they still qualitatively explained how they compared to the benefits. And that matters because if Interior had weighed the risks, maybe they would have offered less lease sales in less areas, and that would have gone a long way to addressing the inequities here. To be clear, we're not arguing the inequities should have been distributed elsewhere, but Interior was required to consider whether those inequities warranted less leasing in the Gulf or leaving some areas like the western Gulf out. Can I, before your time is up, ask about, so the Rice's Whale, certainly some, not exactly clear what Interior did with that, but they do argue that any error was harmless. And it seems to me that for any error there to be prejudicial, you would have to, we would have to think there's a possibility that if the sensitivity score was higher, that Interior would have chosen to do two lease sales or would have chosen a different region. And I would imagine Interior would say, this is just one of many considerations. The sensitivity score was already the highest and so forth. So I just wanted to give you a chance to give your best argument that this, if it was an error, it actually was prejudicial. Thank you, your honor. Yes, I agree with what you're saying, that if the sensitivity score had been higher, that could have led them to have less lease sales, two or one instead of three, or to leave certain areas that are sensitive for Rice's Whale or for other reasons out of the lease offerings. Interior's own analysis showed this, that the sensitivity scores can and do inform whether to exclude certain areas or reduce the size of a lease sale. And including the Rice's Whale would have certainly sent the number up because we're talking about the most insensitive aspect of the Gulf. Is there anything in the record about how much it would have gone up if they had used the Rice's Whale? No, your honor, but this population number is only 50. Its potential biological removal is exponentially lower than the sperm whale species that they chose to use. And it's the most endangered species in this region, if not the U.S. So we're talking about one of the most sensitive aspects of this evaluation. Turning quickly to conflicts, Interior also was required under OCSLA to evaluate other uses and determine whether there's not or may be a conflict with wind development, aquaculture. It didn't do that. It only mentioned these other uses. And this is more stark because Interior did this analysis in other contexts. For wind leasing, for example, it actually evaluated how wind might conflict with oil leasing when it was offering wind leases. But it didn't do the opposite here when they were offering oil leases. It just talked about wind but didn't make a determination about the conflicts or understand what the conflicts were. All right, we'll give you some time to reply. Thank you, your honor. Mr. Anderson. Good morning, your honors. May it please the court, Christopher Anderson for the Department of the Interior. I'd like to begin by talking a little bit about the context of what Interior was trying to do in the five-year program. And in particular, I want to point out two misunderstandings that under gird the petitioner's arguments. First of all, the five-year program is about a broad schedule of lease sales and areas where lease sales may be held. And at this point in the analytical process that Interior was undertaking, Interior was considering only two program areas, the Cook Inlet and the Gulf area. It was not considering smaller geographies in those areas or other parts of the continental shelf. And so when my friend talks about Interior failing to do comparative analyses, that's simply not true. Interior was comparing between the Cook Inlet and the Gulf. It was not doing intra-Gulf comparisons, which it can do at later stages of the leasing process, at the lease sale process. And that is when traditionally Interior has done more focused analysis of that kind. And this court has upheld that approach in Watteau and in other cases. The second thing I want to point out that I think is important to keep in mind when assessing the petitioner's arguments is that the five-year program's purpose is not to determine whether there will be lease sales at all. As this court has held, Congress has already determined that the resources of the outer continental shelf will be used to meet the nation's energy needs. And so Oxler requires Interior to determine how many lease sales will be necessary to meet the nation's energy needs for the five-year program period. So none of the petitioner's arguments in any way call into question Interior's determination that three lease sales were required. Three lease sales, which I might add, is the smallest number of lease sales that have ever been held in any five-year program. And so when petitioners say that if Interior had done more analysis and might have held fewer or smaller lease sales, that argument simply doesn't carry weight with Interior's conclusions. What's your position with respect to the executive orders? Because you all seem to indicate that it's no longer necessary to deal with environmental justice. Is that going to be discretionary going forward if we were to remand? Or will we be looking at it on this record? So it is discretionary going forward for remand. So our position, as we explained in our brief, Oxler itself does not require an evaluation of environmental justice impacts. It does require an evaluation of the human environment, but it doesn't require Interior to undertake an analysis of the distribution of benefits and burdens among various specific communities. The main reason Interior did that was because of prior executive orders which have since been repealed. So on remand, those executive orders no longer require Interior to undertake that analysis. And subsequent executive orders actually significantly constrict the scope of Interior's ability to consider those factors on remand. So we think that if this Court were to find some error in Interior's environmental justice analysis, that error at this point is harmless because on remand, and I say this without prejudging how Interior would act, it is likely, I think that's fair to say, that Oxler does not require us to address environmental justice. The executive orders are gone, and so we'll proceed without that analysis. But if you acknowledged under your model that there were some region-specific vulnerabilities, and as opposing counsel indicated, you did not kind of do a framework analysis at the program stage. So we did do a framework analysis between the Cook Inlet program area and the Gulf program area, and that analysis is part of the proposed final program at J152 to 153. Interior explained how the various benefits and burdens of leasing in those two program areas compared and decided that it made more sense for the reasons that are set forth in the program to hold lease sales only in the Gulf and not in the Cook Inlet area, and that analysis incorporated Interior's analysis of impacts to vulnerable coastal communities in the environmental impact statement, as well as its analysis of benefits to those communities. If I could talk, please. Can you just address the whale? I was just about to move to the rice's whale. Yeah, so you know, I think petitioner's arguments about the whale are both wrong and beside the point, and so they're wrong because Interior's methodology is not as mechanical as the petitioners make it out to be. I will concede that the methodology, which is at JA 1478, is a little, it's not as clearly worded as it might be, but it pretty clearly states at JA 1478 that in addition to the endangered listing, the critical habitat, the potential biological removal issues, Interior will take into account the prevalence of the species in the area under analysis and the amount of information that's available on a species. I think the problem is that there's then no part of the record where Interior says, because of the relatively lower abundance or because of the lower information, we are excluding this whale from the analysis. It just says rice's whale was not selected, and that says a lot of, frankly, confusing things. It is true that it does not say that in the record, but I think two points on that, Your Honor. I think as this Court has held over and over again, a less than perfect record can still be upheld if it's reasonably clear how the agency got where it was going. And so I would point to two things. One is the methodology description itself. And so I think it's fair for the Court to presume that Interior was following the methodology laid out. And then I'd also point to JA 1622. And this doesn't concern the current five-year program, but that is a table that explains why sperm whales were selected in the 2014 analysis. And it was because they were the only whale species present in relatively high abundance in the Gulf. And so, while I will admit it's not a model of clarity, I think that the Court can reasonably infer that Interior was following its past practice with a selection of... One odd thing is that you argue that we should infer that what Interior was thinking was this abundance rationale. And API thinks we should infer that Interior actually excluded it because it only resides in the eastern portion of the Gulf and not the central and western. There actually seem to be more explicit statements that support the latter theory that it was excluded because the main habitat is in this DeSoto Canyon in the eastern Gulf. It sounds like you are not endorsing that version of API's argument. I wouldn't endorse that version to the extent that it suggests that Interior concluded that there was no presence of the whale in the central and western Gulf. But what I would say is that it goes to the point about abundance of the species in the area under consideration. And the Gulf program area is almost entirely in the western and central Gulf. There's a teeny bit in the eastern Gulf. And so, I think they're not completely incompatible explanations. The other thing that I would add on the whale is the relative sensitivity analysis is not the only point at which Interior took Rice's whale into consideration. The Chapter 8 of the proposed final program explicitly states that the Interior's analysis of the 18A2 factors would incorporate the discussion of environmental impacts in the environmental impact statement. And so, I think relative sensitivity is 18A2G, but there's also 18A2H, which requires Interior to consider other environmental information. That other environmental information is the discussion of impacts to Rice's whale in the environmental impact statement. So, that's why we think the petitioner's argument is wrong. We also think the petitioner's argument is beside the point because, as Your Honor pointed out, we think that this argument as to the relative sensitivity analysis is harmless. The record clearly shows that as between the Cook Inlet program area and the Gulf program area, which were the only program areas under consideration at this point, the Gulf had the higher relative sensitivity score. So, for purposes of 18A2G, the Gulf couldn't somehow, with a revised analysis, be more relatively sensitive environmentally than Cook Inlet. I'll ask you a few just contextual questions. The first is, this plan is for three lease sales. Can you explain in practical terms what that means? Because you might offer a whole bunch of acreage in one lease sale, or you might offer a tiny amount of acreage in 20 lease sales. I'm not sure we can find anything in the program that explains what the intention was in that respect. Can you clarify that? Sure, sure. What the program has laid out are three lease sales over the next five years, one in 25, 27, and 29 in the Gulf program area. Interior could choose to offer the entire Gulf program area apart from the areas that are excluded in the program. In practice, what Interior has done at the lease sale stage is to include additional exclusions based on further analysis of the area being offered. So, at the lease sale stage, and I would add, the lease sale stage is a two-year analytical process of its own that includes further environmental review underneath. It includes Endangered Species Act review. It includes additional review of potential complex. And so, at that stage, Interior may decide to offer substantially less than the entire program area. It may decide to offer the program area with specific exclusions, such as the habitat of Rice's Whale. That might be something that comes up in further environmental analysis. And so, those decisions are all deferred until the lease sale stage. And this caught up how that approach in WANT 2. So, I think that that's consistent with how Interior has done this for a long time. And then just the other question is, what is the status of the 2025 lease sale? Because Interior has said it intends to replace this whole program. Right. Is it intending to go forward with the one lease sale in the meantime? Yes, Interior is planning to go forward with a lease sale. In the meantime, on April 30th, Interior published an RFI on the Federal Register to start a new five-year program. That process is going to take, I would say conservatively, at least two years. So, the current five-year program will remain in place while that further program is developing. I see my time has expired. I would just like to, if I could, make one last point, which is to say, having reviewed the intervener's briefing on this issue, the government now agrees the petitioners lack standing. And in particular, I would emphasize that the petitioners could not reasonably believe that their opening brief adequately addressed standing. And in particular, this theory that they are pressing in their reply in an argument today that the seismic surveying will be triggered simply by the program, that does not appear in their opening brief. Dr. Felderbrand's declaration is not cited in their opening brief. And we believe that relying on that now is inconsistent with this court's rules and precedents on the need to establish standing in petitions for review. And just one other question. With respect to the whales again, what is your distinction on how you treated it with respect to the wind leasing versus the oil leasing? Sure. So, in the wind leasing context, there isn't this program stage that we're at now in the oil and gas leasing context. The document that petitioners cite is more akin to the analysis that Interior will do at the lease sale stage in the oil and gas program. And so, at that stage, you would expect to see a similar area-specific analysis for the whale, but not at this program stage where, again, Interior starts with the entire outer continental shelf, narrows it, and at this point had narrowed it and was mainly analyzing between Cook Inlet in Alaska and the Gulf. Thank you. Mr. Murata. Thank you, Your Honor, and may it please the Court. Sean Murata on behalf of the intervener of the American Petroleum Institute. I want to answer your question about how this lease sale works in practice, Judge Garcia, because it is slightly counterintuitive. It's not as if Interior offers the leasing, everybody bids on all the blocks that are offered, and so that's sort of off the table. What happens typically is that Interior will offer the entire Gulf planning area minus some carve-outs for things that are identified during the lease sale process. All of those blocks are offered. Many of them fail to get bids, and then they do it again in the next lease sale. You might say, well, if someone didn't bid in 2025, why would somebody bid in 2027? The reality is that we are constantly gathering data about the possibilities of where oil and gas might be and its economicness to pull out of the ground. So there may be a block that didn't attract a bid previously but does in the future, and that's that iterative process that oil and gas companies engage in. With my time, I want to address standing as well as environmental justice and the harmlessness of the whale analysis to the petitioner has focused on this idea of the seismic surveys. But I think you need to look closely at the declaration, which is addendum page 209. And what Dr. Hildebrand says is that the existence of the program, quote, creates a need for seismic surveys, but does not actually say that the creation of the program causes or leads to additional seismic surveys being performed. And there's a reason for that, because it's at JA656, where Interior explains, marine seismic surveys could occur during any of the phases throughout the life cycle of the project. Oil and gas companies purchase typically seismic surveys conducted by third parties for all sorts of reasons, for leases they've already purchased, for development they're undertaking. So there is no allegation that the five-year program is what is causing additional seismic surveys. Seismic surveys are occurring all the time. And without causation, there cannot be standing. Is there an alternative to seismic surveys? Seismic surveys are performed routinely and they are done, but it's not as if they're done necessarily in response to the five-year program. The way it works in the industry is there are these third-party vessels, they go out, they perform seismic surveys, and they offer it for licensing to oil and gas companies, who then go and purchase it for either planning their bidding or projects they're undertaking or leases they've already purchased. But I think the key point for standing is that addendum page 209 does not allege, and I think quite carefully does not allege, that there is a causal link between the program and additional seismic surveys, because I don't think there is. I think the theory they focused on in the opening brief was sort of the more traditional standing theory in this case, which is, for example, the legal declaration says, I fish in these areas, it's already bothering me, and if there's more oil and gas activity, it's going to bother me more. So it seems like a completely familiar type of standing in these cases. What's insufficient? I think what's insufficient is a couple things. First of all, Interior made clear at JA184 that lease sales are not the same thing as development. Just because you purchase a lease, although my clients would prefer it otherwise, does not mean that there's going to be oil and gas to be found in paying quantities. So just because there is more leasing does not necessarily mean there is more development. Moreover, production, to the extent there is any, is going to be up to five years away. So the question isn't whether Mr. Weigel goes... I certainly appreciate those arguments. They seem like arguments that no one would ever have standing to challenge a program, because it's always prospective. Nothing's going to happen for several years, and that's not how we've approached these cases. I don't think so, because in the previous cases, as we lay out in our brief, this was development in relatively unspoiled areas. So to the extent there was any production, it was going to be impinging on the interest. But here, as petitioners admit and everyone admits, and in fact, the declarations themselves are primarily complaining about the existing oil and gas development. So the question is, I think to a certain extent, how is it making it substantially worse? For instance, one of their declarants complains about the brackish water when they run marine tours, but if the water is brackish already, it's not necessarily clear that their business is going to be much worse off if it were marginally more brackish. So I think that's the sort of thing they need to disaggregate, and they never do. I just want to touch on environmental justice really quickly. I think it's coming back to the language of the statute, and what it says is that the relative impacts analysis must be done among oil and gas-bearing physiographic regions of the outer continental shelf. That is not an environmental justice analysis. It says to focus, one, on the outer continental shelf, which is what WOT 2 brings up, and two, it says to focus on the regions where oil and gas production occurs, not these vulnerable regions that are laid out in the existing documents that, as my friend from the government pointed out, come from the environmental justice executive orders that have since been repealed. And with respect to the repeal, this court does not order Potamkin remands. It does not order pointless analysis on remands. So to merely remand to have the agency say, we don't do that anymore, would be a pointless exercise. So the environmental justice EO has been rescinded, but the statute says you have to consider the equitable sharing of developmental benefits and environmental risks among the various regions, and you might read that as calling for not environmental justice, but considering the impacts on affected communities. Oh, absolutely. And they do consider the Gulf versus, say, Alaska, and what they laid out in both the proposed final plan and the EIS. This is JA 153 for the PFP and JA 721 for the EIS. What they say is, we understand that the Gulf is most impacted of all the regions from oil and gas development, but what we do on the other side is we weigh that against the lost jobs, against the lost industry, against the additional impacts that would come from imports of oil and gas that would be required if we stopped production, and also all the countervailing policies, for instance, considering the preferences of the Gulf governors who have weighed in strongly in favor of continued production. I just want to touch briefly on the whale. With respect to the sensitivity analysis, as the government's brief lays out, this model is purpose-built for this process. There is no sensitivity model that exists in ecology separate from this five-year plan, so it's not as if saying that, oh, well, if it's 25, there's some sort of objective scale in the real world that tells us what a 25 is versus a 20. These numbers exist only within the range of the model. The interior was perfectly aware and said it throughout that it was aware that the Gulf was the most sensitive ecological region, and so simply changing the numbers in their own purpose-built model would not tell decision-makers something they already didn't know when it came to assessing these factors. I think they would say, well, if it turned out the score was much worse, that might have impacted the amount of leasing that they planned to conduct, and the score has to matter for something. Well, the score does matter for something in how it's relative to one another, so understanding that it's greater than one or the other, but it's not as if, as I was saying, there's an objective scale where you say, oh, well, if it's 10 more, that shows that it's 20 times worse or something like that. It's a model that exists only for this analysis, and certainly interior was aware that the Rice's Whale is endangered and that this is the most impacted area, and they considered that as part of all the various factors but decided it didn't carry the day, and at the end of the day, three lease sales is the least, is the lowest that interior has ever engaged in in a five-year plan, so interior actually cut back significantly, and we had a petition review saying something that was too few, so to say that interior didn't take these factors into account and weigh them as part of its analysis I don't think carries the day, unless the court has further questions. All right, thank you. Ms. Hardy, why don't you take two minutes? Thank you, Your Honors. I'd like to make three brief points. Even though there's only three sales, these are huge in size, and they repeatedly harm. First, the respondents were trying to lump the entire Gulf into one area. In the program, they explicitly said that the analysis they were going to do would compare all 26 planning areas, that includes Western and Central Gulf, and compare them against each other. This is at JA 188, but then like respondents did when they were doing the analysis, they lumped them together, which didn't provide the required comparison. Pages 152 to 153 respondents cite is just the conclusion I mentioned. It doesn't provide the support, why the sensitivities of these regions mattered or the evidence is to support it. They didn't do the weighing that respondent interveners talked about. It doesn't appear in the program. Second, on standing, we did cite Hildebrandt's declaration, our opening brief on page 19. They don't provide any arguments or evidence in their briefing about why seismic surveying wouldn't start. All the arguments that were presented by API on standing, your associational standing, were presented in Center for Sustainable Economy and rejected by this court. You can find standing without even having to go to the seismic survey issue itself. On Rice's Whale, as Judge Garcia points out, there is no explanation for this omission in the program or in the EIS. They're trying to cobble something together. They're pointing to various things. They didn't follow their own methodology. There is adequate information about Rice's Whales, as we point out in our brief, and it would make a practical difference now. This is the time when Interior needed to do this analysis. They can't do it later. The program stage prevents cumulative and irreversible harms to Rice's Whales. Even if they're going to exclude areas later, it's really important to do it now because this is a staged, orderly process. The program says we have to do these things now. If you trip up at the first step, you're just tripping up all along the way. Ultimately, what matters here is we have a decision to intensify and extend harms to vulnerable communities who've been suffering for decades and punting these harms down the road, but this is the place where Interior has to address the inequities because this is a decision about how often and how big lease sales will be in what areas. Interior left the most endangered whale out of its sensitivity analysis. It offered up important Rice's Whale habitat without consideration or explanation in this program, and that's the problem. Thank you, your honors.
judges: Henderson; Childs; Garcia